**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

QILI QU,

Petitioner,

v.

ALBERTO GONZALES,* Attorney General,

Respondent.

No. 03-71141

Agency No.
A79-522-726

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Submitted September 2, 2004**
Pasadena, California

Filed March 8, 2005

Before: Stephen Reinhardt, Kim McLane Wardlaw, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Reinhardt

---

*Alberto R. Gonzales is substituted for his predecessor, John Ashcroft, as Attorney General of the United States, pursuant to Fed. R. App. P. 43(c)(2).

**This panel unanimously finds this case suitable for decision without oral argument. See Fed. R. App. P. 34(a)(2).

2933

**COUNSEL**

William Kiang, Law Offices of Kiang & Kiang, San Gabriel, California, for the petitioner-appellant.

John L. Davis, Attorney, Office of Immigration Litigation; Richard M. Evans, Assistant Director; Peter D. Keisler, Assistant Attorney General, Civil Division, Department of Justice, Washington, D.C., for the respondent-appellee.

**OPINION**

REINHARDT, Circuit Judge:

The question before us is whether a husband is entitled to withholding of removal solely by virtue of the fact that his wife has been involuntarily sterilized pursuant to a coercive population control program. We hold that, just as a husband is statutorily eligible for asylum in such circumstance, he is also entitled, without more, to withholding of removal. He

need make no further showing or meet any further conditions nor requirements in order to obtain such relief.[1]

## I.  PROCEDURAL POSTURE

Qili Qu, a native and citizen of China, entered the United States on March 14, 1997 on a valid B-1 visa. He applied for asylum on April 16, 2001. At his immigration hearing, Qu requested asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). On October 9, 2001, an Immigration Judge ("IJ") denied his application for asylum as untimely and rejected all of his requests for relief on the alternative grounds that he did not testify credibly and that he had no future fear of persecution. Qu timely appealed the IJ's decision to the Board of Immigration Appeals ("BIA"), which upheld that decision in all respects on February 13, 2003.

Qu limits his petition for review to two issues: whether the BIA erred in (1) finding that his testimony was not credible and (2) denying him withholding of removal on account of his wife's forced sterilization.[2] In its brief to this court, the government concedes that Qu testified credibly and acknowledges that he suffered persecution when his wife was forcibly sterilized. Therefore, the only remaining issue is whether Qu is entitled, without more, to withholding of removal on account of his wife's forced sterilization.

---

[1]However, the Attorney General may remove an alien who otherwise would qualify for withholding of removal if one of the exceptions listed in 8 U.S.C. § 1231(a)(3)(B) applies, for example, if the alien participated in persecution, has been convicted of a particularly serious crime, committed a serious nonpolitical crime outside the United States, or is a danger to this nation's security.

[2]Qu did not appeal his asylum or CAT claim and, therefore, neither is before us.

## II.   FACTUAL HISTORY

Qu and his wife were married in China in 1978. Shortly after, they applied for a birth permit. However, because Qu's family was considered to be affiliated with one of the "black five" counter-revolutionary elements as a result of its elders' support of the pre-communist regime and adherence to Christian beliefs, Qu and his wife were denied a permit by the Chinese authorities and told to wait to have children. Thereafter, Qu's wife became pregnant and, to avoid a forced abortion, went to the countryside to have the baby. After giving birth in 1979, she left the baby with her mother and returned to the city. When Qu and his wife finally received a birth permit in 1982, she waited a few months and then lied to the birth control officials, falsely informing them that she had just become pregnant. She then went back to the village to pretend to have the child, thereby seeking to legitimize her son's birth. She returned a year later in 1983 and informed the birth control officials that she had had a child and had left him with her parents. The officials eventually became suspicious about the child whom they had never seen and went to Qu's wife's parents' home to investigate. Upon realizing that the child was five instead of one, the Chinese bureaucrats became enraged. Qu and his wife were criticized at public meetings and were forced to return their one child certificate and the subsidies that they had received. In May of 1985, when Qu was away at work, the neighborhood committee found Qu's wife, bound her, and took her to a hospital. Once there, they forcibly and involuntarily sterilized her through a tubal ligation procedure.

## III.   ANALYSIS

In this case, we are required to resolve a question that this court has not previously answered: When a wife is involuntarily sterilized pursuant to a coercive population control program, is the husband entitled by virtue of that fact alone to withholding of removal or may the government rebut his showing of entitlement by establishing that no cause for fear

of additional persecution exists? Our answer is dictated by our previous cases. The involuntary sterilization is sufficient and dispositive.

## A.   Statutory and Regulatory Scheme

Asylum protection for those who have been subjected to persecution as a result of coercive population control policies or who fear such persecution in the future is codified at 8 U.S.C. § 1101(a)(42) (2005):

> For purposes of determinations under this chapter, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, *shall be deemed to have been persecuted* on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

(emphasis added).

[1] The protections for asylum applicants mandated by the statute are implemented through a variety of regulations. Of importance here, if an applicant can establish that he "has suffered persecution in the past . . . on account of . . . political opinion," he has established past persecution and "shall also be presumed to have a well-founded fear of persecution." 8 C.F.R. § 1208.13(b)(1) (2005). In ordinary asylum cases, this presumption can be rebutted by the government if it proves by a preponderance of the evidence either that (1) "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality . . . ." or (2) "[t]he appli-

cant could avoid future persecution by relocating to another part of the applicant's country of nationality . . . ." *Id.*

**[2]** A similar regulatory scheme exists with respect to the relief of withholding of removal. Just as in the asylum context, if an applicant can establish that he "has suffered persecution in the past . . . on account of . . . political opinion," he has established past persecution, and "it shall be presumed that [his] life or freedom would be threatened in the future in the country of removal." 8 C.F.R. § 1208.16(b)(1)(i) (2005). Again, in the ordinary withholding case, the presumption can be rebutted by the government by a preponderance of the evidence if either of two exceptions, which mirror those in the asylum context, is proved: (1) "[t]here has been a fundamental change in circumstances such that the applicant's life or freedom would not be threatened . . . ." or (2) "[t]he applicant could avoid a future threat to his or her life or freedom by relocating to another part of the proposed country of removal . . . ." *Id.*

## B. Ninth Circuit Law On Coercive Population Control Practices

**[3]** In interpreting 8 U.S.C. § 1101(a)(42), this court has held that (1) a showing that an alien has been subjected either to a forced abortion or an involuntary sterilization as a result of a coercive population control program makes that person eligible for asylum, and (2) if a wife has been the victim of the forced abortion or sterilization, the husband, as well as the wife, is eligible for asylum.[3] *See, e.g.*, *Zheng v. Ashcroft*, ___ F.3d ___ (9th Cir. 2005) ("Zheng is therefore eligible for asy-

---

[3]It is now uncontroversial that, while the woman may have suffered the persecution more directly, those harms are properly regarded as harms to the husband as well. This interpretation allows husbands whose wives have suffered a forced abortion or sterilization to apply for asylum in their own right as principal applicants. Although we have not yet had a case presenting the question, it follows that if the husband is involuntarily sterilized, the wife is deemed a victim of persecution as well.

lum because of the forced abortion of his child . . . ."); *Ge v. Ashcroft*, 367 F.3d 1121, 1127 (9th Cir. 2004) ("Ge is automatically eligible for asylum if he can show that his wife was forced to undergo an abortion under China's one-child policy."); *He v. Ashcroft*, 328 F.3d 593, 604 (9th Cir. 2003) (holding that He is "automatically eligible for asylum" based on his wife's involuntary sterilization). We have never explained how the regulatory presumption of a well-founded fear of persecution created by past persecution (and the government's ability to rebut that presumption) applies in cases of forced abortion and sterilization. Instead, we have simply declared that the Congressional meaning is evident: that these individuals are eligible for asylum. *See, e.g.*, *Ge*, 367 F.3d at 1127 ("Accepting Ge's testimony as true, he has conclusively established past persecution and eligibility for asylum."); *He*, 328 F.3d at 604 (holding that an alien subjected to forced sterilization is "automatically classified as a refugee" and not discussing the presumption of well-founded fear or rebuttal).

**[4]** Although our law is clear with respect to eligibility for asylum, we have never decided whether an alien is statutorily entitled to withholding simply by virtue of a forced abortion or involuntary sterilization. Instead, we have usually remanded the question of the availability of withholding relief to the BIA to evaluate in the first instance, generally because the question has been inadequately briefed to this court. *See Zheng v. Ashcroft*, ___ F.3d ___ (remanding the withholding issue because "the parties did not brief the issue of withholding to us on appeal in any detail"); *Li v. Ashcroft*, 356 F.3d 1153, 1161 (9th Cir. 2004) (en banc) (remanding the withholding issue because it "was neither fully briefed nor specifically argued"); *Ge*, 367 F.3d at 1127 (remanding for the BIA to evaluate the withholding issue "in the first instance"); *He*, 328 F.3d at 604 (remanding "for further proceedings on whether Mr. He is eligible for withholding of removal").[4] In

---

[4]In the case of *Wang v. Ashcroft*, we did not need to decide whether Wang, who had suffered forced abortions, was entitled to withholding,

no case in which we remanded a withholding claim, however, did we state that we were required to do so, or that any precedent compelled such action. Moreover, in all of those cases, we found the petitioner eligible for asylum and were required to remand in any event for the exercise of the Attorney General's discretion. The withholding remands were always ancillary to the primary asylum question.

In this case, only Qu's withholding of removal claim is before us, because he does not contest that his application for asylum is time-barred. Moreover, the issue of Qu's entitlement to removal has been fully briefed. Furthermore, here, not only has the BIA explicitly ruled on the issue of Qu's entitlement to withholding of removal, but, as will be discussed below, it has in a subsequent controlling opinion considered the legal issue at length and definitively decided it in a manner that we can now fully evaluate and adopt.

## C.   BIA Precedent

Because of the incremental development of the BIA's law on forced abortion and involuntary sterilization pursuant to coercive population control policies, it is best to address the history of the BIA's precedential decisions and the history of Qu's case before the agency chronologically. Before 1997, claims based on forced abortions and involuntary sterilizations as part of the population control policy of China were governed by *Matter of Chang*. 20 I. & N. Dec. 38, 38 (BIA 1989). There, the BIA held that "[i]mplementation of the one couple, one child policy of the Chinese Government is not on its face persecutive and does not create a well-founded fear of persecution on account of one of the five reasons enumerated in . . . 8 U.S.C. § 1101(a)(42)(A) (1982), even to the extent

without more, because she had established a future fear that it was more likely than not that she would suffer persecution, including that "she will be subject to sterilization and to imprisonment for removing [her] IUD." 341 F.3d 1015, 1018, 1023 (9th Cir. 2003).

that involuntary sterilizations may occur." *Id.* In response to this interpretation, Congress, in the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), amended the definition of refugee to include explicit protection for those who endured or feared forced abortions, involuntary sterilization, or other persecution on account of resistance to coercive population control policies. IIRIRA § 601(a)(1), Pub. L. No. 104-208, 110 Stat. 3009 (1996).

On December 18, 1996, the BIA abandoned its interpretation in *Matter of Chang* in light of IIRIRA's amendment and held that "an applicant's forced sterilization for violation of China's population control policies" constitutes "past persecution." *In re X—P—T—*, 21 I. & N. Dec. 634, 636 (BIA 1996). Under the regulations applicable at the time, this presumption could be rebutted in only one way:[5] if "a preponderance of the evidence establishes that since the time the persecution occurred conditions in the applicant's country . . . have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he were to return." 8 C.F.R. § 208.13 (1996). As the Immigration and Naturalization Service ("INS") "presented no evidence of changed country conditions at the hearing below," the BIA determined that the presumption had not been rebutted. *In re X—P—T—*, 21 I. & N. Dec. at 636. Furthermore, recognizing that "[f]or any fiscal year, not more than a total of 1,000 refugees may be admitted . . . or granted asylum . . . [for] persecution for resistance to coercive population control methods," 8 U.S.C. § 1157(a)(5), the BIA decided that it "will grant the applicant's application for population control-based asylum conditioned upon a subsequent administrative determination by the Service that a number is available . . . ." *In re X—P—T—*, 21 I. & N. Dec. at 637.

---

[5]As discussed above, current regulations allow rebuttal for either a "fundamental change in circumstances" or relocation. 8 C.F.R. § 1208.13(b)(1) (2005).

Additionally, the BIA recognized that it was required to reach the question of withholding in *In re X—P—T—. Id.* at 637. It concluded that "[b]ecause the conditional nature of our asylum grant does not ensure that the applicant will be one of the 1,000 individuals who actually obtains asylum, we find it necessary to reach the issue of withholding of deportation." *Id.* The BIA went on to hold that the applicant was "entitled under C.F.R. § 208.16(b)(2) (1996) to a regulatory presumption." *Id.* Because, as in the asylum context, this presumption could be rebutted only if country conditions had changed—specifically only if "a preponderance of the evidence establishes that conditions in the country have changed to such an extent that it is no longer more likely than not that the applicant would be so persecuted there," *id.*—and because the presumption was "unrebutted in this record" the BIA granted the application for withholding of deportation. *In re X—P—T—,* 21 I. & N. Dec. at 638.

On June 4, 1997, the BIA, in *In re C—Y—Z—,* 21 I. & N. Dec. 915, 918 (BIA 1997), reaffirmed its decision in *In re X—P—T.* In *In re C—Y—Z—,* the INS conceded that involuntary sterilization constituted past persecution, but it contended that in addition an applicant needed to a have a well-founded fear of future persecution or to demonstrate that "the involuntary sterilization was carried out in such a way as to amount to an 'atrocious form' of persecution." *Id.* at 919. The BIA rejected this argument and held that "[t]he regulatory presumption may be rebutted only by a showing, by the preponderance of the evidence, that since the time the persecution occurred, conditions in the applicant's country have changed to such an extent that the applicant no longer has a well-founded fear of persecution if returned to the home country." *Id.* The BIA held that because "the Service [had] not alleged or presented evidence of changed country conditions," it had not rebutted the presumption and therefore the applicant had established his eligibility for asylum. *Id.* The BIA further held that, as the applicant had established past persecution, he was entitled to a presumption with respect to withholding of deportation as

well, and, because the INS had done nothing to rebut the presumption, it granted that relief also.[6] *Id.*

On December 6, 2000, pursuant to a final rule which became effective on January 5, 2001, the regulations concerning the rebuttable presumption for asylum and withholding claims changed. 8 C.F.R. § 208.13(b)(1) (2001); 65 Fed. Reg. 76,121, 76,133 (Dec. 6, 2000); *see also* 8 C.F.R. § 1208.13(b)(1) (2005). The new regulations allowed the INS to rebut the presumption of a well-founded fear of persecution by proving by a preponderance of the evidence either a "fundamental change in circumstances" or the possibility of relocation within the country. 8 C.F.R. § 208.13(b)(1) (2001). Because of this change in the regulations, the IJ in Qu's case decided on October 9, 2001 that "personal circumstances can be considered in changed circumstances and I find that once you're sterilized you can't be sterilized again." He therefore held that Qu no longer had a well-founded fear of persecution.

On April 10, 2002, before Qu's case reached the BIA, the Board decided another forced sterilization case, this time under the new regulation governing rebuttal of the past persecution presumption. *In re G—C—L—*, 23 I. & N. Dec. 359 (BIA 2002). However, because the INS did not offer any "rebuttal evidence during the hearing below and has not submitted any response to the applicant's motion," the BIA concluded that the presumption was not rebutted and granted both asylum, subject to the statutory numerical limitation, and withholding of deportation. *Id.* at 361.

On February 13, 2003, the BIA decided Qu's case in a non-precedential, one-member opinion. The BIA held that because

---

[6]Likewise, on June 25, 1998, the BIA decided *In re X—G—W—*, 22 I. & N. Dec. 71, 74. There, the Board allowed the applicant to file a motion to reopen based on a coercive family practices persecution claim and granted the claim on the basis of past persecution when the INS did not present any evidence of changed country conditions.

Qu remained in China for eleven years after the sterilization and had no reason to fear returning to China until September 2000 when the Chinese government discovered his religious activities,[7] he was not entitled to withholding of removal.

On May 23, 2003, the BIA issued its first precedential decision under the new regulations, in a case in which the INS opposed granting asylum and withholding on the ground that the applicant no longer had a well-founded fear of future persecution. *In re Y—T—L—*, 23 I. & N. Dec. 601 (BIA 2003). Like the IJ in Qu's case, the IJ in *In re Y—T—L—* held that, given that the forced sterilization had already been performed and that no evidence regarding any possible future persecution had been presented, there had been a fundamental change in circumstances such that the applicant no longer had a well-founded fear of persecution. *Id.* at 603. The BIA, however, found this interpretation paradoxical:

> To some extent, therefore, this case presents a dilemma. The respondent has, without question, sustained past persecution, which makes him eligible for asylum . . . . On the other hand, the respondent has no reasonable basis to fear this form of persecution in the future, based on the very fact that he has already been persecuted.

*In re Y—T—L—*, 23 I. & N. Dec. at 606. The BIA resolved this dilemma decisively, both by recognizing "the special nature of the persecution at issue here" and by giving "full force to the intent of Congress." *Id.* On that basis, it held that in such cases "the regulatory presumption of a well-founded fear of persecution arising from such past persecution has not been rebutted." *Id.* at 608.

---

[7]As noted earlier, Qu has limited his petition for review solely to persecution on account of coercive population control practices, so we do not address his claim of religious persecution.

First, the BIA noted that forced sterilization is a unique kind of persecution. In addition to the physical and psychological trauma that is common to many forms of persecution, sterilization involves drastic and emotionally painful consequences that are unending: The couple is forever denied a procreative life together. As the BIA explained,

> The act of forced sterilization should not be viewed as a discrete onetime act, comparable to a term in prison, or an incident of severe beating or even torture. Coerced sterilization is better viewed as a permanent and continuing act of persecution that has deprived a couple of the natural fruits of conjugal life, and the society and comfort of the child or children that might eventually have been born to them.

*Id.* at 607; *see id.* (describing coerced sterilization as persecution that is "profound and permanent"). On this basis, the BIA held that such a permanent and continuous form of persecution requires a special result under the asylum regulations, namely that applicants who have suffered forced or involuntary sterilization necessarily have an inherent well-founded fear of future persecution because such persons will be persecuted for the remainder of their lives due to the sterilization to which they have been subjected.[8]

The BIA also explained that the history of the coerced population control provision in 8 U.S.C. § 1101(a)(42) supported

---

[8]Forced abortion, as a form of persecution, possesses similar unusual characteristics. Again the pain, psychological trauma, and shame are combined with the irremediable and ongoing suffering of being permanently denied the existence of a son or daughter. Thus forced abortions, without more, also likely result in statutory entitlement to asylum eligibility and withholding of removal. In fact, an even stronger argument may exist that the presumption is necessarily rebutted in involuntary abortion cases, because the applicant may still face additional persecution in the future in the form of more forced abortions, involuntary sterilization, and other coercive population control practices.

its view. *Id.* at 607. As discussed above, it is undisputed that Congress amended the definition of refugee in order to overrule *Matter of Chang*, 20 I. & N. Dec. 38, 38 (BIA 1989), the BIA's interpretation of asylum law that denied relief to those subjected to forced abortions and sterilizations by virtue of coercive population control policies. The BIA noted that, in doing so, Congress intended to create asylum eligibility for "past victims of family planning practices." *In re Y—T—L—*, 23 I. & N. Dec. at 607; *see also* 142 Cong. Rec. H2629, H2633 (daily ed. Mar. 21, 1996) (statement of Rep. Christopher Smith) (calling the BIA's interpretation under *Matter of Chang* "novel and bizarre"). Furthermore, as Congress specifically provided that persons who suffered involuntary sterilization "shall be deemed to have been persecuted," 8 U.S.C. § 1101(a)(42), the BIA found it could not categorically deny them asylum, as it would have been forced to do if it adopted the INS's theory that, because the particular act of persecution eliminates any threat of future persecution, such persons could never establish a fear of future persecution. *In re Y—T—L—*, 23 I. & N. Dec. at 607; *see id.* at 605 (explaining that "the Immigration Judge's rationale could lead to the anomalous result that the act of persecution itself would also constitute the change in circumstances that would result in denial of asylum to persons such as the respondent"). Therefore, the BIA granted the applicant asylum subject to the statutory numerical limitation and, on the basis of the same reasoning, also granted him withholding of removal. *Id.* at 608.

### D. Resolution of Qu's Case

**[5]** We agree with the BIA's decision in *In re Y—T—L—* and hold that when a person is involuntarily sterilized a form of harm occurs that constitutes permanent and continuing persecution. Because the persecution is ongoing, we hold that it is not possible, as a matter of law, for conditions to change or relocation to occur that would eliminate a well-founded fear of persecution. Accordingly we hold that when an applicant suffers past persecution by means of an involuntary steriliza-

tion in accordance with a country's coercive population control policy, he is entitled by virtue of that fact alone to withholding of removal.

Involuntary sterilization irrevocably strips persons of one of the important liberties we possess as humans: our reproductive freedom. Therefore, one who has suffered involuntary sterilization, either directly or because of the sterilization of a spouse, is entitled, without more, to withholding of removal. The BIA erred in not granting Qu this relief.

Petition **GRANTED**.